Good morning, may it please the court. My name is John Klein. I represent the appellant Mr. Makras. I'd like to reserve two minutes. In September 2014, which is kind of the key period during this case, Mr. Makras held a promissory note from the Kellys, Harlan and Naomi Kelly, that unconditionally promised for value received that they would pay $915,000. Mr. Makras was called upon to inform the title company and the lender how much the Kellys owed to him and to his investors, and he had a choice. He could report the amount of the note that he held, which was $915,000, or he could report the amount that had been disbursed so far under that note, which was $785,000. Mr. Makras reported the $915,000. That was the correct decision. It was correct as a matter of law, because under California law, he and his investors were owed the full $915,000. Even though only $70,000 had been disbursed. Explain that one to me. Sure. The question is one of consideration, as the district court identified, and there was consideration for the Kellys' promise to pay the full $915,000, and let's focus on the $200,000 that really is the subject of this appeal. What was that consideration? It was several things. Number one, Mr. Makras had October 2013 to June 2014, and then from June 2014 to September 2014. That's number one, and that by itself would be enough to support. An extension of a note for that period of time amounts to a monetary value of $200,000. Is there any law, any California case or anything that you could cite to support that theory of the notion that an extension of debt or forbearance on a debt is consideration for a promissory note? Yes. Beyond that, there was, of course, the promise to pay to advance $200,000. $70,000 had been advanced, but there was also the promise to advance another $130,000. Council, what I'm struggling with is even if you set aside the question of consideration, or was there enough or was there not enough, California law also says that this, the elements of this offense are met if a note is intended as a sham to fool a third party. How is that not satisfied here, where the only reason that the note increased in value was so that a different financial picture could be presented to the bank? There is no evidence at all, A, that that was the purpose of the note, or B, that Mr. Makras understood that was the purpose. I thought the evidence showed that the debtor under the note came to your client and said, I want you to increase the note value. That's true, and Mr. Kelly came to Mr. Makras in April of 2014 and said, please make the note $200,000, and I'm paraphrasing here. So I can give it to the bank, and I won't have problems getting my loan. That is not what he said, and that is, there is nothing in the record to support that, and I want to be clear about that, because the question here is Mr. Makras' knowledge and intent, and there is not a shred of evidence that Mr. Makras understood the purpose of this additional borrowing to be, to somehow fool the bank. And of course... That's hard, that's, I mean, that's a hard argument to make, I think, given the sophistication of your client. I think given the sophistication of my client, that actually supports my argument, because he ends up lending $915,000. He gets a note for $915,000. Now he has to tell the bank, how much do the Kellys owe me? And he tells them $915,000. If he had told them $785,000 and the bank had found out that he was holding a note for $915,000, I think the bank would have felt that it was being deceived. But then it begs the question, why create a note for $915,000 if that money hadn't been dispersed? I mean, you know, you're saying there's no evidence whatsoever, but what about the point that Mr. Makras had also created another note and then backdated it to December 2013? So I guess there is indicia, there are text messages, there are other things that the government presented at the trial that would position as Judge Forreston, you know. Your Honor, with respect, I don't think that evidence is there at all, at least from Mr. Makras' perspective. When you refer to backdating, what had happened is, Mr. Kelly had come to Mr. Makras in late 2013 and said, will you loan me $70,000 to pay down my wife's credit card debt? And Mr. Makras loaned that money. In April 2014, Mr. Kelly comes to Mr. Makras and says, I want to borrow, and I'm paraphrasing because what Mr. Kelly actually wrote is sort of incoherent, but he said, I want to borrow $200,000 for money owed and for, he talks about paying down his wife's student loan. Those are the things that he specifies. And so Mr. Makras creates a note dated December 2013 because that was when he loaned the $70,000 and with another $130,000 built into it. There was nothing in that discussion, and there is zero evidence that Mr. Kelly and Mr. Makras had some understanding that the purpose of this note was to fool the bank. Wasn't Mr. Makras the person that set him up with Mr. Mitchell, the broker? Yes. And there was a couple of times that Mr. Makras was facilitating the Kellys trying to borrow from Sierra, was it Sierra Pacific? That was unsuccessful, and they went over to the other bank. Mr. Makras definitely introduced the Kellys to the loan broker, Mr. Mitchell, of California Real Estate Loans. But, you know, I don't mean to be flip, but there's nothing wrong with that. There's no negative inference to be drawn from a friend introducing another friend to a loan broker, who then from that point on, from the point that Mr. Mitchell gets involved, he handles all the communications with the title company. It's not that there's nothing wrong with it. It's, you know, can a jury not reasonably draw inferences from the collection of these facts together to weight the evidence in a different way than you're suggesting? I don't think so. Right. Because, you know, our review is on the sufficiency of the evidence, which is a very high bar. Right. And it's whether the jury could itself have drawn these inferences reasonably from the collection of evidence that was presented. And the answer to that, Your Honor, is emphatically no. And I get that it's a high bar. We say that in the, you know, first few pages of our brief. Right. But it's not an insuperable bar. And it's a bar that this Court has found met numerous times over the years. And the line is between reasonable inferences and speculation. And here, to conclude that Mr. Macros was engaged in some sort of a scheme with Mr. Kelly is pure speculation. And, I mean, for example, talking about the note being a sham to cover something up. There is – I mean, forgive me for being so emphatic. There is no evidence that Mr. Macros was participating in a sham, that he viewed this as a sham, that he viewed it as anything other than what it was, which was a loan to a friend. I'm happy to deal with more questions, but – Why don't we reserve the time for – All right. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Amanda Mundell on behalf of the United States. I'd like to start by reminding the Court what the standard of review here is on the Rule 29 issue. Mr. Macros faces a very high bar, as this counsel recognizes. He has to show that no rational juror could have found him guilty of either of the offenses, that the verdict rested on sheer speculation. And I want to address the two points that counsel is focused on here, first, with respect to the amount of the loan, and second, with respect to intent. Because a rational juror could have found that Mr. Macros made false statements to the bank and participated in this bank fraud. It is just simply undisputed on the record that we have that there was no $200,000 loan. It's undisputed that Mr. Macros never gave the Kellys a penny more than $70,000. Those facts are undisputed. And when we think about both what he knew about the loan process, how experienced he was, and also how involved he was in the Kellys' application to get this loan, a rational juror could find that Mr. Macros knew those statements were false. And I want to talk about this California law point that has come up, because the California law issue was really not an issue that even the jury was aware of. It popped up for the first time in the district court's assessment of the Rule 29 motion. California law doesn't help Mr. Macros here. There is simply no California case or any other decision that would support the idea that someone can promise to make an advance of, say, $200,000 to somebody and then demand that they repay that money back, even if they never got it in the first place. That's what his argument boils down to, and that's simply unsupported in California law. And even if it were a close question as to whether Mr. Macros thought the note was enforceable for an amount that he had never actually lent, that's not actually the issue here. What matters is what the documents conveyed to Quicken, what Quicken believed. And again, it's undisputed that Quicken believed when it read that $200,000 note, when it read the $915,000 mortgage, that it thought those loan amounts had actually been loaned, not that it was a line of credit and not that it was an advance. And it's that representation that matters and what Quicken believed to be represented to it. So then let's talk about intent. A rational juror could find that Mr. Macros, making these statements, intended to influence the behavior of Quicken to give this loan to the Kellys. The record is replete with references to evidence that Mr. Macros was shepherding them through the process. I think, Judge Sanchez, you mentioned that he connected the Kellys to the mortgage broker. That's true. He also advised the Kellys on how to make the loan process easier. In a text message, he explains, I should actually pay your credit card debt directly because that way banks don't like to see large amounts going in and out of accounts. That's not it. There's also text messages between him and Mr. Kelly throughout the process. Mr. Kelly advising, I want to get $200,000 cash out. Can you put a note saying I owe it? That's not a request for an advance. That's a request to create a note for a $200,000 loan that hadn't yet been made. And that's not it. There's additional text messages from Kelly telling Mr. Macros that he needs that note to get the loan he wants and the amount he wants for the rate he wants. And there's more. Mr. Macros helped prepare those documents, not just the $200,000 straight note, but the $915,000 note, which says that he was owed a principal sum of $915,000. The verification of the mortgage form, which again, in his handwriting, verified that there was a $915,000 mortgage on the property, when in reality, as we all know, he hadn't lent the Kellys anything more than $70,000. None of that required the jury to speculate as to whether Mr. Macros knew the statements he was making were false, whether he lacked the intent to have those statements influence Quicken's behavior. Mr. Macros is an experienced real estate broker. He was involved in decades of this business. He was involved in transactions like this before. And the back and forth between him and Mr. Mitchell and emails and text messages with the Kellys all show that he had an intent to influence Quicken. Your Honors, unless there's any other questions, we'd simply ask that this Court affirm. Okay. Thank you. Thank you. Judge Sanchez, first to your question to me, I believe, about California cases in consideration. The two cases that we cite, it's on page 17 of our brief, Long v. Thompson and Pageto v. Bowen, both cited in full on page 17 of our brief from the California Court of Appeals. The government counsel just said what matters here is what Quicken believed. That's certainly relevant to materiality. But what really matters here is what Mr. Macros knew and intended. And there is no evidence that Mr. Macros knew that this was some sort of a scam because it wasn't or that he intended to defraud the bank. The evidence just isn't there. There aren't text messages back and forth between Mr. Macros and Mr. Kelly talking about scamming the bank or trying to hide something. It just didn't happen. This question about the $915,000, it is really important, and the district court recognized this but got it wrong. It's really important to focus on whether that statement was accurate, and it was. And the key California provision of law is California UCC 3303B. And what that says in essence is if you have a promissory note and if the consideration for the note is a promise, then to the extent the promise has been called upon to be performed and has not been performed, then the promissor on the note has a defensive lack of consideration. That didn't happen here. Mr. Macros' promise, forgive me, I'm going a little bit over. Yeah, well, and I think we do have your arguments on the briefs. I think we know what the argument is, so we appreciate it. I mean, if you want to sum up, but I think we know what you want to say. I think you do know what I want to say. All right. Thank you. All right, thank you so much. Thank you to both counsel and the case. The case is now submitted.
judges: NELSON, FORREST, SANCHEZ